SOCIAL MEDIA VICTIMS LAW CENTER
Laura Marquez-Garrett SBN 221542
laura@socialmediavictims.org
Matthew P. Bergman
matt@socialmediavictims.org
Glenn S. Draper
glenn@socialmediavictims.org
Sydney Lottes, SBN 345387
sydney@socialmediavictims.org
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862

Attorneys for Plaintiffs

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| A.C. and JOHN DOE, | Case No.: |
| Plaintiffs, | COMPLAINT FOR PERSONAL INJURIES |
| vs. | JURY TRIAL DEMAND |
| META PLATFORMS, INC., *formerly known as* FACEBOOK, INC.; SNAP, INC.; and DOES 1 – 100, INCLUSIVE, | |
| Defendants. | |

COME NOW PLAINTIFFS A.C. and JOHN DOE and allege as follows:

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiff A.C., individually and on behalf of his minor child, John Doe, brings this action for personal injuries against Meta Platforms, Inc., formerly known as Facebook, Inc., and Snap, Inc., for injuries caused to each of them as a result of John Doe's use of the defective and inherently dangerous Instagram and Snapchat social media products and alleges as follows:

## I.      INTRODUCTION

1.      This product liability action seeks to hold Defendants' Instagram and Snapchat products responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Meta and Snap, and specifically for the injuries they caused Plaintiffs A.C. and John Doe in 2022, when John Doe was only 14. John Doe and A.C.'s injuries were proximately caused by Defendants' defective and unreasonably dangerous Instagram and Snapchat products, including specific product features that are unnecessary to the functionality of their products and are known by them to be harmful to a significant number of their minor users. The injuries at issue in this lawsuit include but are not limited to anxiety, depression, exploitation, and related mental health harms suffered by John Doe and his father as a result of Defendant Meta and Snap's actions and failures to act.

2.      Meta and Snap target and market their products to children and teens, representing to the public, and even Congress, that their social media products are not addictive and are designed to be fun and safe for kids, and that they use all available technologies to keep underage users safe.

3.      In truth, however, Defendants' products are designed in a manner that encourages and assists minor users in evading parental authority and control, resulting in Defendants'

distribution and profits from distribution of their products to millions of unauthorized, minor users; Defendants have invested billions of dollars to design and develop addictive product features, including features designed to exploit minor users' physiological and psychosocial vulnerabilities; and Defendants have designed, and implement in the case of minor accounts, specific product features that promote and enable the connection of minors with predatory adults and resulting exploitation and abuse of the kinds at issue in this case. Moreover, Defendants then designed their products and processes in a manner that prevents parents from protecting their children from the harms being caused by and/or perpetrated because of Defendants' social media products.

4.    Defendants know or should know of each of these product defects and/or inherently harmful product features, and the harms directly and proximately caused by them.

5.    Meta and Snap do not warn users or parents about these known defects and/or inherently dangerous product features and, again, do not provide reasonable, accessible, and effectual reporting mechanisms for parents to protect their children from these harms. On the contrary, Defendants' reporting systems are designed and/or operated in such a defective manner that even parents who work in the technology industry are powerless to protect their children and others from identified harms.

6.    Plaintiffs bring claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

7.    Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from foreseeable use of their social media products. The addictive qualities of Defendants' products and harms caused by their recommendation technologies, account settings, and other product features were known to Defendants but are unknown to minor users and their parents.

8.      Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise of ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to redesign their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their product.

9.      Plaintiffs bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

10.      Plaintiffs bring claims for invasion of privacy. Defendants' conduct detailed herein frustrated and intruded upon Plaintiff A.C.'s fundamental right to protect his child and to monitor and control his child's use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

11.      Lastly, Plaintiffs bring claims for intentional and/or negligent infliction of emotional distress against Defendant Meta. Meta is distributing a defective product and/or a product that is inherently harmful to a significant number of its minor users, and then deprives parents of any reasonable or effective means to report and put a stop to such harms.  Even when Meta receives reports, it routinely does not act or acts in a manner insufficient to protect minor users from the reported harms, which failures foreseeably and proximately cause extreme stress, anxiety, and emotional harm to reporting parents, in this case, Plaintiff A.C.

## II.      PARTIES

12.      Plaintiff A.C. is the parent and legal guardian of John Doe and John Doe is currently 15 years old.  Plaintiff A.C. has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with John Doe's use of Defendants' products and disaffirms all agreements that John Doe may have entered with Defendants. As such, Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in any such agreements.

13.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, which are made widely available to users throughout the United States, and manufactures and sells the Oculus virtual reality headset, which it operates directly via its Facebook social media platform, also made widely available to users throughout the United States.

14.     At all times relevant hereto, Defendant Meta Platforms, Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Meta Platforms, Inc.

15.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

16.     At all times relevant hereto, Defendant Snap, Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Snap, Inc.

### III.     JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Defendants are residents of different states.

18.     This Court has general jurisdiction over Defendants Meta and Snap because their principal place of business is in California, and they are "at home" in this State. This Court also has specific jurisdiction over Defendants because Plaintiffs' claims set forth herein arise out of and relate to its activities in the State of California.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Meta resides in the Northern District of California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

20.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove known dangerous designs and design defects as well as other dangers caused by the social media products of both Defendants.[1]

21.     Defendants have knowledge about the harms their products cause users, particularly teens, children, and other vulnerable user populations, and Defendants continue to operate their products in a harmful and dangerous manner anyway.

22.     Defendants are making calculated cost-benefit business decisions and are prioritizing their already astronomical profits over human life.

**A.     Meta and its Facebook and Instagram Products**

23.     "Facebook connects people. It's what we do. And real connection can only happen on safe and secure platforms. That's why we build technology that gives you more control and helps keep you safe." These words are the opening lines from a television advertisement Meta— the creator of popular social media platform Facebook—launched earlier this year. As these words are spoken by a voice actor, images of smiling Facebook users—many of whom, like in the screenshot from this advertisement below, appear to be children—flash on screen. The advertisement goes on to identify a number of specific safety features, including "industry leading AI" that represent "tools that can protect—so you can connect."

---

[1] Examples of the Facebook papers have been published by the Wall Street Journal (https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/), Gizmodo (https://gizmodo.com/facebook-papers-how-to-read-1848702919), and other publishers, and have been disclosed to the SEC, Congress, and others on a global scale. Plaintiffs expressly incorporate all such documents into this Complaint by reference, which are central and material to certain of Plaintiffs' claims.



24.    This is not a new message for Meta. Since the company's initial public offering (and before), Meta claimed that Facebook (and later, Meta's Instagram product) "include[s] robust safety tools" and "take[s] into account the unique needs of teenagers who use our service." It has repeated variations of these claims a staggering number of times in a wide variety of mediums. Over and over again, Meta has claimed that Facebook and Instagram are safe for children and teenagers to use because of the company's algorithmic and non-algorithmic safety tools.

25.    Meta was founded in 2004 and is the world's largest social media company. While Instagram began as a simple photo-sharing application, which Meta purchased in 2012.

26.    When Meta began, access to its products was limited to college students, with email and/or domain verification to confirm the same. Then, in September 2006, Meta opened Facebook up to everyone. It claimed that it provided access only to persons 13 and older, and that users under 18 should obtain parental consent. But it stopped verifying age or identity, to the point where Meta does not even verify existence of a valid email address – meaning that underage users and predators enter nonsense email addresses and Meta provides access to limitless Facebook and Instagram accounts anyway. These product changes have proven good for Meta's bottom line but resulted in the complete absence of any safety features for children and teens.

27.    In 2009, Meta launched the "like" button product and, in 2011, it launched Facebook Messenger. By 2012, when Meta acquired the Instagram social media product, it was

making rapid and significant changes to all its social media products – including Facebook and Instagram – which changes focused entirely on increasing engagement at any cost. This included product changes, as well as changes in data collection and advertising policies and procedures; essentially any change Meta could devise that might bolster engagement and revenue, particularly among children and teens, and create greater addiction and network effects features to ensure that those users would be locked-in to its social media products for years to come – but at the expense of user safety and autonomy.

28.     To name only one example, Meta developed and patented its News Feed product, *see* U.S. Patent No. 8,171,128, "Communicating a newsfeed of media content on a member's interactions in a social network environment" (filed August 11, 2006, granted May 1, 2012). The patent "describes keeping a profile of each person on the social network in a database, identifying relationships between said users, generating 'stories' based on the connections, and then creating a News Feed for each user."[2] Internal Meta documents confirm that in or around 2016 Meta made changes to operation of its News Feed product, which significantly increased engagement, at the expense of user safety. This was only one such change made by Meta in that time frame.

29.     With the knowledge that teen and child users were Meta's only opportunity for growth in the United States, Meta ramped up its marketing to children and teens – including and specifically to children under the age of 13. It designed several new products and re-designed several existing products on its Facebook and Instagram platforms, launched and marketed games and emojis, and became significantly more involved with content creation. It also made it easier for kids to hide accounts and switch between accounts on a single device and, at one point, launched a campaign to ensure that all teens knew of their ability to open multiple accounts.

30.     Meta also creates images and GIFs for users to post on their videos and pictures in

---

[2] *See* https://www.zdnet.com/article/facebook-patents-the-news-feed/; *see also, e.g.* https://info.ipvisioninc.com/blog/4-creepy-facebook-patents-that-are-actually-real (discusses various, invasive social media products for which Meta has obtained patents, which Meta may or may not be using on its users – which information is known only to Meta); https://www.forbes.com/sites/nicolemartin1/2018/11/20/facebook-files-algorithm-patent-to-predict-who-you-live-with/?sh=3b987fe73544 (discussing Facebook patent application to use algorithms to determine who lives in the same household);

connection with its Facebook and Instagram products. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook and/or Instagram. The GIFs, images, and music are integral to the user's post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook and/or Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement, advertising revenue, and other profits for Meta itself.

31.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. To name only one example, in 2012, Meta revised its Instagram Terms of Service to the following,[3]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion and in connection with all its social media products.

32.     Meta knows that it is harming teens yet, when faced with recommendations that would reduce such harms, Meta's leadership has consistently opted for prioritization of profit over

---

[3] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

the health and well-being of its teen users – including product changes that, if adopted by Meta, would have prevented harms at issue in this lawsuit.

**B.    Snap and its Snapchat Product**

33.    Snapchat was founded in 2011, by three Stanford college students, and was originally called *Pictaboo*. It started as a simple app with the idea that it would be nice to be able to send photos to friends that would disappear. Months after its launch, *Pictaboo* had only amassed 127 users,[4] however, so it changed its name to Snapchat and began marketing to and targeting high school students. Within a year, and with its new target audience of children and teens, Snapchat grew to more than 100,000 users.

34.    The Snapchat social media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to, and that did, increase its popularity among minors. This included video capabilities (2012); "Stories" and "Chat" features (2013); live video chat capabilities, text conversations, "Our Story," Geofilters, and Snapcash (2014); Discovery, QR code incorporation, and facial recognition software (2015); Memories and Snapchat Groups (2016).

35.    By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

36.    The Snapchat product is best known for its self-destructing content feature. Snap's product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. Snap emphasizes that everything you do on Snap disappears, and even notifies senders when someone takes a screenshot. These products and promises appeal to minor users, and encourage and allow minor users to exchange harmful, illegal, and sexually explicit images

---

[4] *See* https://frozenfire.com/history-of-snapchat/

with adults. But also, these products provide predators with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of these product features.[5]

37.     Snap is widely accepted in the social media industry as having cornered the market on teen and tween engagement. It is the most popular social media product among tweens, teens, and young adults in the United States, and Snap works hard to market to and target this demographic – from product designs and features to commercials and merchandise to its logo. Snap's well-known logo is a ghost against a brightly colored background and some of the products for which it is best known include silly photo filters and bitmoji (cartoons).



38.     Snap currently estimates more than 93 million Snapchat users in the U.S., including 17 million under the age of 18.

39.     Snap claims that it does not provide its product to children under 13 or children under 18 without parental consent. However, Snap designs and operates its product in a manner

---

[5] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/

that is intended to evade parental consent, does not provide parents with a 1-800 number or staffed email address to report unauthorized use by their children, and often does not stop distributing its product even when it knows or should know that parental consent is lacking.

40.     For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[6] yet has kept those features in place as removing them would impact the popularity of Snap's social media product. Harmful and dangerous interactions occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens. But also, Snapchat does not operate as advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens who rely on Snap when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result.

41.     Snap has developed images for users to decorate the pictures or videos they post. Snap also has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat. These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting

---

[6] *See, e.g.,* https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

that minor users experience from third-party postings on Defendant Snap's platform.

42.     Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

//

//

//

//

### 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above.

**C.      Defendants Designed and Distributed Inherently Dangerous and/or Defective Products to Minors and Failed to Warn**

43.     Meta and Snap's social media products contain countless features that serve no critical purpose relating to product functionality or a user's ability to access other users' content. While this complaint addresses known features, on information and belief, there are countless other

features currently unknown to Plaintiffs for the simple reason that these Defendants have concealed the truth and operate with zero transparency. Upon information and belief, it is in the public interest for this Court to permit discovery of all such product features and processes. The following describe just some such features and defective designs.

44.     Meta and Snap design their products in a manner that results in evasion of parental consent and control.

45.     Meta and Snap claim to impose age restrictions for use of their products, including that users must be at least 13 and must (or should, in the case of Meta) obtain parental consent if under the age of 18. Nevertheless, Defendants provide access to millions of minors under 13, or under 18 without parental consent and know or should know that these users are not authorized.

46.     Meta and Snap also design product features that assist minor users in evasion of parental oversight and otherwise prevent parents from reasonable access to their children's activities. Snapchat's self-destructing content design feature is one example, with Meta having implemented a similar (though not default) feature in its Instagram product in late 2021. Defendants also do not restrict access by minors based on excessive or unhealthy use and do not notify parents concerning excessive, unhealthy, or other dangerous use, despite Defendants' actual tracking and knowledge of the same.  Defendants do not notify parents when their children are contacted or solicited by adults; do not verify emails or phone numbers; do not prevent minors from opening multiple, secret accounts; and do not otherwise implement reasonable processes for enforcement of their stated age limitations and restrictions, or enforcement of other terms represented by Defendants as having been put in place for the safety of their users.

47.     Meta and Snap also do not provide parents with an accessible, effective, and staffed reporting mechanism for unauthorized use by their minor children, and/or illegal or harmful activity. In short, when harms occur and are identified by parents, more often than not, those parents are then powerless to protect their children because of Meta and Snap's inadequate designs.

48.     Meta and Snap offer limited in-app reporting features, which they do not explain or disclose to parents prior to use of their apps by minor children.  But also, those in-app features

require that parents either have access to their child's accounts, which often they do not, or their own accounts. Moreover, the in-app reporting mechanisms are defective and/or ineffective, and Meta does not respond to those reports in a manner designed to protect its minor users – as illustrated by Meta's lack of response and insufficient response to the harms at issue in this complaint.

49.     Meta and Snap's public profile settings and product features – in place at all times relevant to this Complaint – are also inherently dangerous and/or defective when utilized in connection with minor users. Public profile and view settings allow strangers to view and message underage users and connect strangers with underage users, resulting in exploitation and abuse. Defendants have the ability to restrict minor accounts, set those accounts to private, limit the information collected and disseminated/utilized in connection with those accounts, limit the use of recommendation technologies [product features] in connection with those accounts, and several other programming and/or product design changes Defendants could implement in a quick and cost-effective manner in order to better protect their minor users from these harms.

50.     Meta and Snap's direct messaging and recommendation technologies are also inherently dangerous and defective when utilized in connection with minor users.  Defendants direct-messaging products provide other users—including anonymous and semi-anonymous adult users, bullies, and other strangers for whom a parent would not allow access—with unrestricted and unsupervised access to minor users. Minor users lack the cognitive ability and life experience to identify online grooming behavior by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material and mass-messaging capabilities. And again, there are several programming and/or product design changes Defendants could implement to protect their youngest users but choose not to as a matter of Defendants' cost-benefit analysis.

51.     Lastly, Meta and Snap employ recommendation technologies, through which they affirmatively recommend and connect users to other users and/or groups.  In Snap's case this is called "Quick Add," while Defendant Meta calls this "People You May Know" for its Facebook product and "Suggestions for You" for its Instagram product. These technologies function in a

similar (if not the same) manner; specifically, Defendants' technologies/products utilize the extensive user data and information it collects from users to affirmatively direct users to one another in a manner intended to increase Defendants' own engagement and, thus, profits. Defendants' technologies/products push messages to users recommending that they connect, follow, friend, or otherwise, without regard to the risks caused by such affirmative connection efforts.

52.   Meta, for example, has actual knowledge that its user recommendation technologies facilitate and contribute to most of the adult/minor grooming and exploitation that occurs on Meta's platform. Yet Meta has opted to continue utilizing those recommendation products anyway. //

53.   Each of the above-described products is dangerous alone but are substantially more dangerous when combined. For example, Defendants' direct-messaging products are more dangerous when coupled with minor accounts of which parents have no knowledge (or means to monitor) and do not consent; and when combined with Defendants' public profile and recommendation features.

54.   Meta and Snap have purposely designed their products to be as addictive as possible and have actual knowledge of the harm these addictive features cause. Defendants knowingly or purposely designed their products to encourage addictive behaviors, for example,

    a. Instagram is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Examples of this include but are not limited to "likes," "followers," algorithm-controlled feed, and unlimited scrolling features.

    b. Snapchat features a series of rewards including trophies, streaks, and other signals of social recognition. These variable and unknown reward and reminder systems are particularly addictive, especially in the case of children and teens.

Other product examples include recommendation technologies and unlimited scrolling features.

55.     These product features serve no purpose other than creating dependencies on Meta and Snap's products by children and teens, resulting in sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

56.     Meta and Snap also send push notifications and emails to encourage addictive behavior and to increase use of their social media products. Defendants' communications are triggered and based upon information collected from and about their users, and Defendants "push" these communications to teen users in excessive numbers and at disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Defendants' social media products, resulting in greater profits to Meta and Snap.

57.     These are just known examples, and Plaintiff A.C. believes that he will identify other examples of harmful product features through discovery in this case.

58.     But also, Meta and Snap have each developed artificial intelligence technology that detects adult users who send sexually explicit content to children and receive sexually explicit images from children. These technologies furnish Meta and Snap with actual knowledge that a significant number of minor users of their products are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Meta and Snap *could* protect their minor users, but in many instances, do not.

**D.     Defendants' Social Media Products are Products**

59.     Instagram and Snapchat are products that are designed and manufactured by Meta and Snap respectively. These products are designed to be used by children and are actively marketed to children throughout the world.

60.     Meta and Snap make and distribute Instagram and Snapchat, respectively, with the intent that they be used and consumed by the public as part of Meta and Snap's regular business.

61.     Meta and Snap design Instagram and Snapchat to be used by minors and actively market Instagram and Snapchat to minors across the United States.

62.     Meta and Snap refer to their social media products and product features as "products," and designate them as products when it is to their benefit to do so.

**E.     Defendants' Business Model is Based on Maximizing User Screen Time**

63.     Meta and Snap advertise their products as "free" because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Meta and Snap make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Meta and Snap receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Meta and Snap also receive revenue from selling their users' data to third parties.

64.     The amount of revenue Meta and Snap receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

65.     Meta and Snap use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Meta and Snap know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by minor users, and Meta and Snap knowingly design their products to encourage such addictive behaviors. This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

66.     Instagram and Snapchat are designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous.

67.     According to industry insiders, Meta and Snap have employed thousands of psychologists and engineers to help make their products maximally addicting; to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging,

notifications, live stories, and "pull to refresh" features (based on how slot machines operate, this creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities).

68. Meta and Snap know that their products are addictive, and that millions of teen users want to stop using them but cannot.

69. Meta and Snap have also designed their products to maximize users' screen time by using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to some of the largest technology companies in the world.

70. Meta and Snap's recommendation systems select potential contacts and content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to Meta and Snap's social media products. In the words of one, high-level departing Meta employee:

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[7]

71. Meta and Snap have designed algorithm-controlled product features to promote content and connections most likely to increase user engagement, despite their knowledge that content that generates extreme psychological reactions in minor users is more likely to trigger their engagement than content that is benign. Defendants expose users to significant amounts of content and connections that they would never see and/or meet but for Defendants' products and designs,

---

[7] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

including content and connections that are inherently harmful to minor users' health.

**F.     Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Social Media Products with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Influences**

72.     The human brain is still developing during adolescence in ways consistent with the demonstrated psychosocial immaturity of adolescents.  Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

73.     The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

74.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

75.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

76.     The technologies in Meta and Snap's social media products are designed to exploit

the diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency of minor users caused by incomplete brain development. Meta and Snap know that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Meta and Snap's social media platforms and are therefore much more likely to become addicted to Meta and Snap's products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Meta and Snap also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users.

77.     Nevertheless, Meta and Snap designed their social media products to be addictive to minor users and failed to include safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

**G.     Defendants Misrepresent the Addictive Design of Their Social Media Products**

78.     Meta and Snap do not warn users of the addictive or harmful design of their products. On the contrary, they consistently play down their products' negative effects on teens in public statements and advertising but then refuse to make their research public or available to academics or lawmakers who ask for it.

79.     During the relevant time period, Meta and Snap represented to the public and governments around the world that their products were safe and not addictive, and not designed to be addictive. Defendants knew or should have known that their statements were false or materially misleading.

80.     During the relevant time period, Meta and Snap advertised via commercials and/or third parties that their products were fun and safe to use, age-appropriate for children as young as 12+, and that they employed their technologies to protect minor users from harm. Defendants knew or should have known that their statements were false or materially misleading.

81.     Meta and Snap did not warn users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst some minor users.

82.     Meta and Snap did not warn users or their parents of the harms certain of their

product features cause, particularly to minor users, such as public profile settings, unrestricted direct messaging, anonymous or semi-anonymous profiles, user recommendations, and similar.

**H.      Plaintiffs Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

83.     Plaintiffs seek to hold Meta and Snap accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Meta and Snap's status as designers, distributors, and marketers of defective social media products, as well as Meta and Snap's own statements and actions, and failures to warn and act, and not as the speaker or publisher of third-party content.

84.     Meta and Snap designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. Meta and Snap's product features are addictive and harmful without regard to any content that may exist on Defendants' platforms.

85.     Meta and Snap have designed other product features that encourage and assist children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of their products and are harmful without regard to any content that may exist on Defendants' platforms.

86.     Meta and Snap's products identify minors and collect a myriad of personal and device data points from those minors, both on and off their platforms, then use those extensive data points to direct specific content and connections to minors aimed at increasing minor user engagement with their social media products. These technologies and Defendants' design, operation, and programming of the same affirmatively direct harmful content and predatory adult users to Defendants' vulnerable minor users, which harms Defendants know or should know about.

87.     Meta and Snap are responsible for these harms, which are caused by Defendants' designs and design-decisions, not any third party or third-party content. Indeed, while it may be that a third party creates a particular piece of harmful content, the teens and children harmed by Meta and Snap's social media products are not being harmed by a single piece of harmful content. They are being harmed by Meta and Snap's products, programming, and decisions to continue exposing teens and children to harmful product features in the name of engagement.

88.     None of Plaintiffs' Claims for Relief set forth herein treat Meta and Snap as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta and Snap liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipated use of their products. Defendants could manifestly fulfill their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third-party post or communication. Some examples include,

     a.  Prioritizing internally their existing programming when it comes to content pushed to users as well as enforcement of their own terms of service and community standards.

     b.  Requiring identification upon opening of a new account and parental consent for users under 18 (which Snap currently claims to do but does not actually enforce) and restricting users under 18 to a single account.

     c.  Email and phone number verification when any user opens a new account.

     d.  Setting all minor accounts to private, and not allowing public profiles for any person under the age of 18.

     e.  Limiting the types of data collected from minor users and not utilizing user, group, or content recommendation technologies on minor accounts, and otherwise limiting direct messaging products with any user under 18.

     f.  Decreasing the speed of their recommendation technologies on minor accounts and restricting access for minors to addictive product features.

89.     These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost and all of which can be accomplished by Defendants unilaterally and without regard to third party content.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

90.     John Doe currently is only 15 years old.

91.     He is a mature, respectful, and upbeat person, who enjoys playing sports and is well-liked by his teachers and friends.

92.     John Doe opened his first Instagram account when he was only 10 years old, and he did so without his father's knowledge or consent. Meta undertakes no reasonable effort to verify age or parental consent and makes its social media product available to minors in a way that makes it impossible for parents to prevent such access – even when they try.

93.     Specifically, in October of 2017, John Doe went on a trip to Japan with his grandparents.  His grandfather provided him with a cell phone upon arriving in Japan.  One day later, John Doe opened his first Instagram account, without his parent or grandparents' knowledge or consent. He was underage, which fact Meta knew or should have known based on his Instagram activity and/or data Meta routinely collects from users, including information that informs Meta of each user's estimated actual age. Meta allowed him to use the account regardless.

94.     A.C. only discovered the account because John Doe commented on an Instagram post published by someone who knew A.C., and who notified A.C. of his son's account. Upon John Doe's return from Japan the phone was confiscated and put in A.C.'s room for safe keeping, and John Doe was told that he could not use Instagram. Again, however, Meta takes no reasonable steps to confirm parental knowledge and consent, making it easy for underage children to continue using its social media product.

95.     John Doe began sneaking into his father's room and would use the phone to access Instagram then put it back when he was done. John Doe was a good kid, and never gave his father reason to mistrust him; however, and like many kids, his growing desire to continue using the Instagram product caused him to act in uncharacteristic ways.

96.     One day in 2018, John Doe snuck into his father's room only to find that the phone was no longer there.  This also did not prevent him from accessing Instagram. Instead, he began using his computer and continued to use Instagram without his father's knowledge or consent.

97.     Accessing Instagram via computer was not the same, however, so John Doe began looking for solutions. In November 2018, he used a Visa gift card he had received (likely for his birthday) to purchase a Samsung Galaxy S Blaze from eBay.  But the Instagram app wouldn't update on that phone, so he used a gift card to purchase an LG Ultimate 2, also on eBay, and kept the device hidden from his father. A.C. had no idea this was happening, while Meta did – at least,

the details of each new device and each new Instagram download are among the data points Meta collects from every user every time an account is accessed.

98.     John Doe also accessed Instagram on a family device used for Pokémon GO.  This was a device A.C. had purchased to replace his aging personal phone, but he was unhappy with the quality of the camera, so he disconnected the phone service, and they began using the device to play Pokémon GO together. On one occasion, he allowed John Doe to take the phone to a sleepover, on the condition that he would use it to play Pokémon GO only. While his father had no reason to mistrust him, it now appears from Meta's data that John Doe accessed his Instagram account on that Wi-Fi accessible device on that one occasion as well.

99.     When A.C. discovered John Doe's secret phone, they discussed the situation. John Doe already understood that his purchase and use of a phone without his father's permission was wrong, but also, they discussed why it was so important for his parent to be aware of what he was doing and for him to obtain parental permission and to keep his word.  John Doe was not allowed to keep using the secret phone.

100.    It was not until late 2018 when John Doe got his own cell phone.  He and his father discussed responsibility, the need for a device that could actually make and receive phone calls, and the importance of using that device with A.C.'s permission and in ways of which he approved. John Doe was not allowed to have an Instagram account.  However, he began using his new cell phone for Instagram in March of 2019 and added his number to his Instagram account in July of 2020. John Doe was once again using Instagram without his father's knowledge or consent.

101.    In late 2019, A.C. realized that John Doe was using Instagram.  More to the point, he realized that he could not physically stop John Doe from using Instagram or Meta from distributing its product to his son. Meta made no reasonable effort to verify age or parental consent and made its product available to children on all manner of electronic devices, which devices are everywhere. He also understood that John Doe was using Instagram to browse photos and videos and to communicate with his friends. Under the circumstances, the only way A.C. could help protect his son was to exercise parental control and oversight in his son's use of Instagram.

102.    A.C. did not consent to John Doe using Instagram, but Meta had no reporting or

protection mechanism to prevent such use. A.C. understood, based on Meta marketing and reputation, that the biggest concern with Instagram was posting of potentially embarrassing content and kids being mean to one another. For these reasons, he talked with his son about taking care in comments made to others, he required access and reviewed John Doe's account and communications and prohibited him from publishing posts. Ultimately, A.C. had no means to enforce these rules and now knows that John Doe did not always follow them.

103.   By early 2020, John Doe was allowed to publish posts as long as he first obtained A.C.'s review and approval – which he did, for the most part.  In January of 2021, A.C. opened his own Instagram, in the hopes that he could obtain a better sense of his son's use and activities. Eventually, he allowed John Doe to post without first seeking approval, based on his track record of trustworthiness in this regard and because, with his own account, A.C. was receiving a notification each time his son posted and was able to then review.

104.   Like Meta, Snap also designs and distributes its product in a manner that allows minors to use the Snapchat product without parental knowledge or consent.

105.   A.C. does not know when John Doe opened his first Snapchat account and only learned that John Doe had a Snapchat account *after* the events in this complaint took place. John Doe opened that account without his father's knowledge or consent.

106.   John Doe's use of Instagram and Snapchat resulted in his exploitation, and caused and/or worsened depression, anxiety, and obsessive behaviors – which harms were not just foreseeable by Meta and Snap but have been identified by Defendant Meta as among the types of harms use of its social media products cause for a significant number of minor users.

107.   On May 10, 2022, Instagram user **_louis_moring_** connected with minor user John Doe via Meta's product features, including the Suggested for You and/or public profile features. **_louis_moring_** did not know John Doe in real life and would never have found him but for decisions Meta made over the last several years with regard to its product design and distribution. **_louis_moring_** likewise would not have been able to initiate direct and unsupervised contact with minor John Doe but for those Meta decisions.

108.   Instagram user **_louis_moring_** began by following John Doe's Instagram account.

1   John Doe was generally cautious, based on discussions with his father, and removed people he did

2   not recognize or know in real life. This is what he did with **_louis_moring_**, only for that user to

3   re-follow him quickly thereafter and then engage with him via Meta's direct message product.

4          109.    **_louis_moring_** posed as a young, female user at all times relevant.

5          110.    John Doe asked if he knew her, and she replied by expressing sexual interest in

6   him. John Doe was a 14-year-old boy and was predictably responsive to **_louis_moring_**'s

7   overtures. Moreover, **_louis_moring_** had more than a thousand followers on Instagram,

8   conveying that she was an established and trustworthy user who had not been reported to

9   Instagram, was not a catfish, and was someone he could trust. **_louis_moring_** began sending him

10  provocative photos and videos and asked him to send provocative photos and videos in return.



20         111.    John Doe was reluctant to send photos of himself at first, even after

21  **_louis_moring_** purported to send photos and videos of "herself." Then the suggestion of

22  Snapchat came up, and John Doe agreed and shared his Snapchat username with **_louis_moring_**.

23  John Doe believed that he could safely share such content on Snapchat because of Snap's

24  disappearing content features. He knew that this was something kids his age used Snapchat to do,

25  and reasonably believed that there was little to no risk as long as he sent the content via Snapchat.

26         112.    On May 11, 2022, John Doe used the Snapchat product to send three illicit photos

27  and two illicit videos to the user who contacted him via Instagram, with the understanding and

28  belief that this was a relatively safe way to send such content since it would disappear once viewed.

Instead, the user – a complete stranger to minor John Doe – sent him back a collage of his photos, via the Snapchat product, and told him that if he did not pay them immediately they would be sharing the three illicit photos and two illicit videos of John Doe to his family and friends. John Doe did not know that others could capture his content and is still not certain as to how **_louis_moring_** was able to do so given how the Snapchat product is advertised by Snap.

113.   John Doe's Instagram and Snap profiles were publicly viewable when **_louis_moring_** found him, which both Defendants previously utilized as account defaults even on minor accounts. But for public profile and viewability settings, **_louis_moring_** would not have been able to find John Doe in the first place and would not have been able to see and take note of all of John Doe's "friends" on the two social media products, and even "friends" of "friends." These are inherently dangerous settings, particularly when it comes to minors like John Doe.

114.   But also, these two social media products – Instagram and Snapchat – work together to amplify and exacerbate the harm. A common pattern among predators is to use Instagram's public profile and recommendation features and settings to find minors to exploit, then convince those children to either provide their Snapchat username to them or open a Snapchat account to enable such exploitation in what adult and minor users believe to be a risk-free environment.

115.   John Doe attempted to block the user from his Snapchat account, so **_louis_moring_** reached back out to him via direct message on his Instagram account.

116.   On May 11, 2022, **_louis_moring_** used Meta's product features to start a Group Chat, which they titled "ABOUT TO EXPOSE [JOHN DOE]" while repeatedly sending direct message threats to then 14-year-old John Doe that if he did not pay immediately his photos and videos would be published to friends and family.

117.   From May 11 through May 13, 2022, John Doe tried changing his Instagram username, blocking **_louis_moring_** from his Instagram account, changing his profile text, changing his profile settings to private, and anything else he could think to protect himself – but nothing worked. That is simply not how Meta's products are designed; Meta's products prioritize user engagement at the expense of user safety.

118.   No matter what John Doe did, **_louis_moring_** got through to him using

1   Defendants social media products and product features and made their intention clear, and then
2   14-year-old John Doe suffered greatly as a result.

3       119.    Then **_louis_moring_** began adding people John Doe knew in real life to the Group
4   Chat "she" created on Instagram, and where "she" had published his intimate photos and videos.
5   This content was taken of then 14-year-old John Doe and, as such, constitutes Child Sexual Abuse
6   Material (CSAM) and publication of that material was illegal in multiple regards.



20      120.    A.C. had no way of knowing what was happening to his own child under his own
21  roof because of the Instagram and Snap social media products; but they spent every day together
22  and A.C. knew that something was wrong. He noticed a change in John Doe's mood starting on
23  May 11, 2022. John Doe was normally upbeat, chatty, and happy, but had become distracted,
24  bothered, and withdrawn. He was no longer interested in talking about his favorite sports or
25  engaging in conversation.

26      121.    A.C. attempted to check in with John Doe and asked if he was okay.

27      122.    On May 14, 2022, A.C. asked John Doe if there was something going on that he
28  did not know about, and John Doe said "yes." A.C. asked if he wanted to talk about it, and John

Doe said "no."  However, when A.C. asked whether John Doe would be okay, John Doe said "I don't know," which is when A.C. knew that he couldn't simply let it go. After several more questions and well-placed concern, John Doe finally told his father everything and A.C. immediately set out to help protect his son – not just from _louis_moring_ but also from the harms Snap's product already had caused and Meta's product was still causing to his son.

123.   _louis_moring_ was just one "person," who did not know John Doe and could not have done anything to hurt John Doe but for Meta and Snap's products, failures to warn, and failures to provide any sort of reasonable safety features or reporting and enforcement mechanisms. Meta and Snap made it possible for that stranger to exploit and threaten A.C.'s son, publish illicit and illegal content, seemingly without recourse, harass John Doe via private message features, find and then harass John Doe's friends and family and even *their* friends and family, and otherwise perpetrate these harms. Meta and Snap never should have provided John Doe with access to their products in the first place, and now A.C. needed to find a way to report and stop the harm that was being caused.

124.   Only, as A.C. soon learned, Meta and Snap also designed their products in a manner that makes the successful reporting and the protection of minors all but impossible.

125.   First, A.C. researched the Instagram product. He read every article he could find to try to stop what was happening. When that didn't help, he started looking for information on Meta's direct message and Group Chat features, then read through every Meta "Support" document he found and scoured Meta's sites and the internet at large to find a Meta support number he could call to report what was happening – no such number existed, and nothing he found told him how to stop what was happening. Meta provided no phone number or monitored email address for reporting, and no immediate response mechanism, no matter how serious the harm. Meta did not even provide a button minor users can use to report exploitation and harm occurring because of the platform in order to obtain immediate help from Meta, despite representing in its terms to users that it utilizes its technology to keep them safe. A.C. had no way to report the illicit images of his minor child or get them taken down. He could not even stop them from being published and copied countless times via Meta's servers, which is precisely what was happening.

126.    The most A.C. could do was to navigate to the **_louis_moring_** account and select a report account option (which had to be done from an existing Instagram account – which thankfully he had) and hope Meta received and acted on it immediately. Even then, A.C. could only select from one of a number of pre-designated reporting descriptions, without any option for direct contact with a Meta representative or any way to provide additional information.

127.    On May 14, 2022, A.C. reported the **_louis_moring_** account via John Doe's account and his own, requested and downloaded an export of all content and data from John Doe's account, then deleted John Doe's account and uninstalled the Instagram app in the hopes that he could stop what Instagram was allowing.

128.    On May 15, 2022, A.C. asked another Instagram user, whose name he had seen in the Group Chat before having taken the steps above, to check their Instagram account. The Group Chat was not only still there – it now included more than 17 people, most of whom knew A.C. and John Doe in real life and many of whom were John Doe's classmates and friends (who also are minors). A.C.'s report to Meta appeared to have done nothing.

129.    24 hours passed, and Meta had yet to take any action with regard to the **_louis_moring_** account, as that account was still up and active – and actively causing harm to John Doe and A.C.

130.    May 15 was a Sunday. A.C. spent it with his son to make sure he was okay. They talked about how to handle school the next day. They came up with a plan in case things went bad and John Doe needed his father to come get him. They talked about what could happen, and how things might be okay.

131.    A.C. did everything he could to protect his son – including from the harm John Doe might suffer and/or cause himself because of Meta's failure to act on A.C.'s report.  A.C. was extremely concerned and wanted to know that John Doe was not going to hurt himself.

132.    On May 16, John Doe went to school and made it through the day.

133.    Since making his report on May 14, A.C. had not stopped checking Instagram in the hopes that Meta had taken some action to protect his son from the known and ongoing harm that was snowballing out of control because of its social media product. On May 17, he received a

1    notification from Meta on his Instagram app and, when he opened the app on his Android, it simply

2    said that his report was still "In Review." A.C. was distraught and devastated.

3    //

4    //

5    //



134.    A.C. immediately checked the **_louis_moring_** account and was distressed to find it still active. Shortly thereafter he checked Instagram again, this time from his computer via the Firefox web browser, and this time he got the message that Meta could not review his report due to a technical issue. Meta suggested that he try reporting **_louis_moring_** again.



135.    To be clear, this was not an update but, in fact, Meta responded to the same report A.C. had submitted in two different ways, depending on how A.C. accessed his Instagram account. These responses reflect a fundamental defect in Meta's reporting mechanisms, and this was not the only time that this defect resulted in harm to Plaintiff A.C. and his son.

136.    A.C. works with computers and technology for a living, and quite literally could not get through to anyone at Meta and could not get Meta to take down the CSAM it was hosting or to otherwise stop the incredible harms it was causing to his then 14-year-old son.

137.    At this point, A.C. had been trying everything for more than three days, anxiously waiting for Meta to act and constantly worrying about his son's safety and well-being. He knew that his son's intimate photos and videos were accessible to his classmates and others, and he could not even get Meta – arguably the most sophisticated tech company in the world – to review the offending account due to what Meta claimed to be a "technical issue."

138.    In the meantime, Meta continued to earn revenue from the **_louis_moring_** account and all of the related account activity described above.

139.    Up to this point, A.C. had researched every Instagram report option and support form and had followed Meta's instructions precisely. As required by Meta he did not report the Instagram user multiple times from a single account and did not falsely answer a question on any report form available on the Instagram website (and in answering the questions honestly *there was no form he could submit*). So, on May 17, 2022, A.C. went back to Meta's Help Center.

140.    Meta's Help Center provided two web forms for reporting content/accounts, (1) Report Harassment or Bullying on Instagram and (2) Report Violations of Our Community Guidelines. A.C. then tried to submit reports through these mechanisms, but when attempting to file a report using either form (and answering the questions honestly), one of the four following events occurred,

      a.  Meta presented a message stating that if you have an Instagram account "you can report a photo or video from within the app." And the form discontinued or became disabled.

      b.  Meta presented a message stating that "If you're not able to view the content

you need to report, please have a friend copy and send you the link. Then, come back here to report it. Note: You won't be able to submit this form unless you have the link to the abusive content." And the form discontinued or became disabled.

c.   The Meta form presented a field requiring a link to the content being reported in order to submit the form (which doesn't exist in the case of abusive photos or messages within a Group Chat).

d.   The webpage immediately, unexpectedly, and for no apparent reason, redirected to a generic, unrelated help page (taking him away from the form).

141.   Being a web developer, A.C. tried completing the forms Meta provided when logged in and out of Instagram, from different web browsers, devices, and network connections, to ensure that the outcome was not unique to him. It wasn't. The barrier was with Meta alone, evidencing additional product defects and resulting in more harms to A.C. and his son.

142.   At this point, A.C. again reported the **_louis_moring_** account from within the Instagram app. Sensing that this was a dead end, he searched for any possible means of getting someone (anyone) at Meta to see the details of the harms that were taking place. He took the following three actions.

143.   First, he reported the details of what was happening and the "technical issue" via the "Report a Problem" feature in the Instagram app (intended for reporting technical bugs, not abuse). His report read:

> I received a notification from Instagram stating there was a "technical issue" reviewing the account I reported. The offending account (**_louis_moring_**) is actively engaging in sextortion – sharing sexual images of others (including minors) with the victim's followers via Group Chat/Direct Message and demanding payment for their removal. As we (the victim/victim's parent) no longer have access to the Group Chat/DM we are helpless and unable to report anything other than the perpetrator's account, which leads to the "technical issues" noted above. The attached screenshot of the exploitative Group Chat was taken by another recipient before they deleted the message. I have redacted the victim/recipient details from the screenshot to protect their privacy. We urgently need Instagram to review this issue. The sexual images of victims remain accessible to recipients of the Group Chat request (friends/acquaintances/etc.) and many others are undoubtedly being victimized. Please help.

He included a screenshot of the Group Chat with the "bug report" submission.

144.     Second, he again reported the **_louis_moring_** account, via the "Report Violations of Our Community Guidelines" web form, selecting that he did not have an Instagram account, which was the only method of actually submitting details via either form.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

Submitted from: <u>Instagram Website Form</u>

Submission details were as follows:

*Do you have an Instagram account?*
Selection: No

*Where does the violation you're reporting appear?*
Selection: An entire profile

*How is this profile violating our guidelines?*
Selection: Nudity or pornography

*Your Instagram username (if applicable):*
████████████

*Your email address:*
██████████

*Username of the person who posted the content you are reporting:*
_louis_moring_

*Full name of the person who posted the content as listed on their account (optional):*
Louis moring savoy

*Username(s) of the profile(s) you are reporting*
_louis_moring_

*Do you know this person in real life?*
No.

*Additional information:*

The offending account (_louis_moring_) is actively engaging in sextortion -- sharing sexual images of others (including minors) with the victim's followers via Group Chat/Direct Message, and demanding payment for their removal.

This is in direct violation of Instagram's policies: "We have zero tolerance when it comes to sharing sexual content involving minors or threatening to post intimate images of others."

As we (the victim/victim's parent) no longer have access to the Group Chat/DM, we are helpless and unable to report anything other than the perpetrator's account.

We urgently need Instagram to unsend/delete Group Chats/DMs created by the "_louis_moring_" user and terminate their account (after an appropriate review, of course).  While we wait, the sexual images of victims remain accessible by recipients, and many others are undoubtedly being victimized/extorted. Please, please help.  Thank you.

145.     Third, he replied to the auto-response email he received from Meta after completing the report web form with further details and screenshots. Here is the auto-response Meta sent:

//

//

//

//

On Tue, May 17, 2022 at 6:26 PM, Facebook <info████████████@support.facebook.com> wrote:

> Hi,
>
> Thanks for contacting us. We've received your report and will review it in the order in which it was received.
>
> We require specific pieces of information in order to take action on your report:
> - A link to the content you're reporting
> - The username of the abusive profile
> - A description of how the content is abusive
>
> If you didn't previously provide us with this information, please do so now by responding to this message. Though you may not receive any further response from us, we are reviewing your report and will take the appropriate action based on our Terms.
>
> Keep in mind that you can always block someone if you don't like what they're sharing on Instagram:
> http://help.instagram.com/454180787965921?ref=cr
>
> You can also change your profile's visibility to private:
> https://help.instagram.com/448523408565555?ref=cr
>
> Thanks,
> The Instagram Team

And here is the response A.C. sent back to Meta,



146.    On May 18, A.C. continued to monitor the _louis_moring_ account and check his reports and emails for any status update from Meta.

147.    Finally, on Wednesday, May 18, 2022, the _louis_moring_ Instagram profile web page showed "Sorry, this page isn't available." It took Meta several days and countless reports to presumably take down a predator user – though A.C. could not even be certain that Meta had taken down the account.  A.C. also had no way to know or confirm whether the Group Chat and exploitative photos and videos of his son were still accessible to others.

148.    Moreover, A.C. never received confirmation from Instagram that the _louis_moring_ account had in fact been removed. A.C. searched himself for any means to

confirm that the account was removed (as opposed to the account holder changing its username or temporarily disabling the account) and discovered that none exists. Further, when he checked on May 18, 2022, via the Instagram app, he had the same "In Review" message for his reports of **_louis_moring_** made May 14 and May 17.

149.    A.C. continued to actively monitor the report status and *to this day* – almost five months after he made the first report – his Instagram app still states that the reports are "In Review."

150.    In the meantime, A.C. could not be certain whether the account was removed; was aware that there was still a chance that the Group Chat containing his son's illicit photos and videos still existed and was accessible to an unknown number of people; was aware that the perpetrator was still in possession of his son's photos and videos, and could continue distributing and publishing them; and was painfully aware that the perpetrator was surely victimizing other children while Meta refused to act on knowledge in its actual possession (several times over).

151.    A.C. became distraught and emotionally distressed as a direct and proximate result and proceeded to monitor Instagram daily in the coming weeks. No matter what he did, he could not get through to anyone at Meta and his many reports and details of the harms its product was causing – not just to his son but to other children – went unresolved.

152.    Meta designed its system in such a manner that it provided ambiguous, conflicting, and/or unpredictable responses, all of which were automated and generic. Meta did not provide any means or mechanism through which A.C. could interact directly with a human being capable of helping him address the serious and ongoing harms being caused to his child, and others.

153.    On May 21, 2022, A.C. discovered that the Instagram predator was using another Instagram account. Not knowing whether Meta removed the reported account, A.C. had been regularly searching Instagram for the **_louis_moring_** username to make sure that the predatory account was not active. On May 21, when running this same search, a previously unidentified account that clearly belonged to the Instagram predator appeared.

1
2
3
4
5
6
7
8
9
10
11



12   The Instagram predator's username had gone from **_louis_moring_** to **louis_savoy_moring404**
13   and even included the same photo as in the originally reported account.

14       154.    On information and belief, the Instagram predator was also likely using the same
15   IP address and device ID, which data Meta collects and tracks each time a user logs into their
16   Instagram account. Some of this data is unique, such that Meta could easily enforce its terms and
17   promises to users and parents and could protect users by simply not permitting banned users – like
18   this Instagram predator – to access or open additional Instagram accounts. In fact, opening a new
19   account after having one removed is explicitly in violation of Meta's terms of use. Yet, on
20   information and belief, Meta does not take reasonable steps to identify banned users, as it would
21   necessarily have to do in order to enforce its own terms.

22       155.    Meta did not enforce its own terms in this instance, with regard to a violating user
23   that A.C. was able to identify with a single key-word search. At the same time, Meta profits with
24   each new account opened and used, and profited from its choice to allow the offending user to
25   continue using its product.

26       156.    But also, like this predatory user's prior account, this newly identified account
27   already had hundreds of followers, which likely would mislead other minor users into thinking
28

that the account holder was who the account claimed they were – which A.C. does not believe to be the case. Either this account had been around for some time, or this account holder was able to utilize Meta's systems to quickly populate their account with followers.

157.    However, Meta is able to quickly identify instances of abnormal and suspicious account activity, including things like follower churn and/or the addition of a significant number of followers from common sources, locations, and/or devices, which are indicative of predatory users and single user multiple accounts. Indeed, Meta claims to collect extensive and invasive personal, device, geographic, and other types of data for this very reason – to keep its users safe. Meta's Data Policy provides just some examples of the types of data it collects,

- **Your usage.** We collect information about how you use our Products, such as the types of content you view or engage with; the features you use; the actions you take; the people or accounts you interact with; and the time, frequency and duration of your activities. For example, we log when you're using and have last used our Products, and what posts, videos and other content you view on our Products. We also collect information about how you use features like our camera.

While Meta's Data Policy and Terms of Use, respectively, claim that Meta is collecting this data in order to keep users safe and to investigate the types of reports Meta received from A.C.,

Promote safety, integrity and security.

We use the information we have to verify accounts and activity, combat harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of our Products, and promote safety and security on and off of Meta Products. For example, we use data we have to investigate suspicious activity or violations of our terms or policies, or to detect when someone needs help. To learn more, visit the Facebook Security Help Center and Instagram Security Tips.

- **Fostering a positive, inclusive, and safe environment.**
  We develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive, including when we think they might need help. We also have teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have-including your information-to try to keep our platform secure. We also may share information about misuse or harmful content with other Meta Companies or law enforcement. Learn more in the Data Policy.

- **Developing and using technologies that help us consistently serve our growing community.**
  Organizing and analyzing information for our growing community is central to our Service. A big part of our Service is creating and using cutting-edge technologies that help us personalize, protect, and improve our Service on an incredibly large scale for a broad global community. Technologies like artificial intelligence and machine learning give us the power to apply complex processes across our Service. Automated technologies also help us ensure the functionality and integrity of our Service.

158.    But as evidenced by what happened here, Meta does not in fact utilize the data it collects to keep its users safe – at least not in any reasonable and/or routine manner. If Meta did, it would be identifying and removing predators like this one well before they obtained hundreds, even thousands, of followers; and *before* they could exploit and abuse minor users, like John Doe, via Instagram and Meta's public profile and direct messaging product features.

159.    Instead, this Instagram predator was able to open or access multiple accounts, even after being reported and despite Meta's actual knowledge that they were exploiting minors and knowingly circulating Child Sexual Abuse Material via Meta's Instagram product for purposes of extortion. Instagram had actual knowledge of the harms and victims of these abuses.

160.    On May 21, A.C. immediately reported this additional Instagram account via the Instagram app and the "Report Violations of Our Community Guidelines" form on the Instagram website. A.C. provided the following details to Instagram via the web form,

> The louis_savoy_moring404 account is engaging in sextortion.  Please see my ticket submitted on 5/17/22 regarding the _louis_moring_ user.  This account is clearly a re-creation of the recently-removed "_louis_moring_" (identical profile picture, username/name similarity).  The owner of these accounts is pretending to be a young woman; soliciting sexual images of men/boys (including minors/children); sharing the sexual images via Group Chat/Direct Message with the victim's friends, family, classmates, acquaintances/etc.; and threatening/demanding payment (extortion) for the removal of the images.
>
> As stated in this report and my previous report, the bullying/harassment/extortion/solicitation and distribution of child pornography is taking place in Group Chat/Direct Message, and I therefore am unable to report the content itself.  My son is a victim of this crime, by this same individual/extortion group.  I too feel personally violated and victimized by the malicious user's actions. I am extremely frustrated by Instagram's inability to identify/prevent this type of abuse -- especially in the case of a re-created account such a this, which is so easily identifiable and uses exactly the same profile image as the original.
>
> Lives are at risk every moment this account is left online (or any other accounts the owners create). Children are being bullied, extorted, harassed, and are at risk of suicide.
>
> I would like a representative of Instagram to follow up with me to confirm the removal of this account and detail how this ongoing criminal activity will be addressed moving forward.

On May 22, after seeing that the reported account was still active on Instagram, A.C. sent a detailed response to the automated email Meta's systems sent him,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



161.     This time it didn't take Meta four days. A.C. received confirmation later on May

22 that the **louis_savoy_moring404** Instagram account had been removed for violating

Instagram's Community Guidelines.



17

18

19

20

21

22

23

24

25

26

27

28

162.     Only it turns out that Meta let the Instagram predator open a seemingly unlimited number of Instagram accounts, all using the same or similar photos and/or variations of the same first and last name. A.C. identified more than a dozen different accounts readily identifiable as belonging to this same Instagram predator.  There are undoubtedly more; A.C. simply needed to stop looking for his own physical and emotional health.

163.     Meta could very easily use the data it collects to identify and block individuals who pose a threat to minors and have already been found to have violated Meta's terms in a serious and/or harmful manner. Meta has the ability to block not just the reported username, but all usernames reasonably associated with the violating user.  This type of unilateral step would be taken without regard to any content and would protect millions of children from these types of harms; it would also, of course, impact Meta in that such predatory users would no longer be able to open and operate multiple Instagram accounts.

164.     Meta does not warn minor users or their parents that it does not block users found to have violated its terms and/or used its product for illegal activities. On the contrary, Meta represents that it uses its technology and the data it collects from users to keep children safe.

165.     On May 24, 2022, A.C. found another account opened by the Instagram predator, which embedded the same photo as the first two and used the same first and last name,



166.    A.C. submitted the same types of reports, but this time Meta did nothing. On May 26, 2022, seeing that the **rebecca_louis_moring69** account was still active, A.C. sent a follow up email to Meta, including a graphic demonstrating the predator's account history, the ongoing situation, and the seriousness of the situation. He wrote, "Please review the screenshots I have included, providing evidence of this user's ongoing criminal activity. I reported the account on Tuesday, May 24, and it is still active and continuing to victimize children. Please, please help."



167.    Only then did Meta remove the **rebecca_louis_moring69** account. It took multiple reports over several days and A.C. sending Meta a detailed timeline with screen shots, including an article about a 17-year-old boy who died of suicide after being sextorted.[8] A.C. wrote, "*This is the result of sextortion. Please help.*"

---

[8] https://www.cnn.com/2022/05/20/us/ryan-last-suicide-sextortion-california/index.html

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



## A 17-year-old boy died by suicide hours after being scammed. The FBI says it's part of a troubling increase in 'sextortion' cases.

By Josh Campbell and Jason Kravarik, CNN  May 29, 2022  Updated Jun 26, 2022  💬 0

1 of 2

Ryan Last received a message on a school night in February from someone he believed to be a girl.

Within hours, the 17-year-old, straight-A student and Boy Scout had died by suicide.

> "Somebody reached out to him pretending to be a girl, and they started a conversation," his mother, Pauline Stuart, told CNN, fighting back tears as she described what happened to her son days after she and Ryan had finished visiting several colleges he was considering attending after graduating high school.
>
> The online conversation quickly grew intimate, and then turned criminal.
>
> The scammer -- posing as a young girl -- sent Ryan a nude photo and then asked Ryan to share an explicit image of himself in return. Immediately after Ryan shared an intimate photo of his own, the cybercriminal demanded $5,000, threatening to make the photo public and send it to Ryan's family and friends.
>
> The San Jose, California, teen told the cybercriminal he could not pay the full amount, and the demand was ultimately lowered to a fraction of the original figure -- $150. But after paying the scammers from his college savings, Stuart said, "They kept demanding more and more and putting lots of continued pressure on him."
>
> At the time, Stuart knew none of what her son was experiencing. She learned the details after law enforcement investigators reconstructed the events leading up to his death.
>
> She had said goodnight to Ryan at 10 p.m., and described him as her usually happy son. By 2 a.m., he had been scammed, and taken his life. Ryan left behind a suicide note describing how embarrassed he was for himself and the family.

168.    A.C. provided this information to Meta, in the hopes of reaching a human being at Meta who could help him protect his son and other children being harmed by the identified and

reported Instagram predator (in the exact same manner as described in this article). A.C. was terrified and shaken, thinking of how close his own son had come to these same feelings of despair because of what Snap and Meta did. A.C. felt an obligation to do everything he could to report this predator and to save other children from the same fate.

169.   And at all times Meta had the ability to block the predatory user, but instead, its systems were designed in such a manner that A.C. had no way to connect with a living person; and when he did manage to get a report submitted through Meta's defective in-app and Help Center reporting mechanisms, Meta's responses were inconsistent and unhelpful.

170.   Meta at all times had the ability to block predatory users on a unilateral basis but delayed and/or failed to do so. More children were victimized as a direct and proximate result.

171.   To this day, the Instagram predator continues to operate on the Instagram platform without consequence and Meta continues to profit directly and/or indirectly as a result. A.C. has identified numerous different accounts, which identification is quick and easy – even without the knowledge and resources of Meta Platforms, Inc. The following is just one more example, which account A.C. identified on June 13, 2022,



172.   Again, the Instagram predator used the *same* photo and *same* first and last name as part of their Instagram Username. Again, A.C. reported the Instagram predator to Meta, using the *same* methods he used to report the other violating accounts.

//

173.    This time, however, Meta sent A.C. two entirely different automated responses, depending on whether he accessed Instagram via his web browser or the app. Both responses stated that Meta had not or would not be acting on A.C.'s report.

174.    Specifically, when A.C. checked with the web browser, Meta's automated response was that the account "likely doesn't go against [Meta's] Community Guidelines."



175.    Though when A.C. checked in-app, Meta's response to the same report once again differed.  In-app, Meta told A.C. that it didn't remove the account due to the high volume of reports Meta receives. That is, three days later and according to Meta's in-app message it had not yet even reviewed the report of exploitation and abuse.

//

//

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12



13   176.   Following the above responses from Meta, A.C. submitted additional reports and

14   documentation to Meta in further hopes that Meta would act. As of June 23, 2022 – 10 days after

15   discovering the account and submitting the initial report – the **louis._moring** account was still

16   active on the Instagram platform.

17   177.   This user also and again has a significant number of followers, particularly if the

18   account was relatively new – suggesting a common pattern, which would also be identifiable and

19   known to Meta itself, but to no one else. Meta has the ability to cross reference the multiple

20   reported accounts, check their followers and the time and manner in which those followers were

21   added, and enforce the law and its own terms by using that data to identify and stop known

22   Instagram predators actively using the Instagram product to prey on minor users.

23   178.   Meta was negligent, if not willful, in its failure to remove accounts operated by this

24   particular Instagram predator despite A.C.'s continued reporting and submission of ever-growing

25   details and evidence.

26   179.   At this point, A.C. is trying to protect not just his minor child but the other minors

27   who are being exploited and abused because of Meta's Instagram product, while Meta itself

28

continues to profit directly and indirectly from this criminal enterprise. Indeed, the above photos are just *some* of the reports and information A.C. provided to Meta in and after May 2022.

180.    In June of 2022, John Doe began complaining of various problems, including headaches, inability to sleep and waking up with racing thoughts, rapid heartbeat, sharp, localized pain that comes and goes in his neck, lower back, and legs, tingling and numbness in his palms and fingertips, shortness of breath and feeling like he "can't breathe or take a deep breath," jaw clenching, mood fluctuations, and stress and anxiety.

181.    John Doe reported in the weeks that followed that what happened in May 2022 popped into his head a couple times each day. He tried to not think about it, but then it would be there, and he felt inside like he did when the whole thing happened. He felt like his world was falling apart; he suffered from a generalized feeling of doom, which he couldn't shake the rest of the day.

182.    A.C. has taken John Doe to the doctor and is taking him to counseling. John Doe has been seriously and irreparably harmed.  He has worked on these issues for several months with professional support and the ongoing support of his family; and the current plan is to take things day-by-day and see how they progress.

183.    A.C. has also been seriously and irreparably harmed as a result of Meta's distribution of its social media product to his son, its complete failure to provide any reasonable reporting mechanism in connection with that distribution, and its failure to act despite A.C.'s many detailed reports and pleas for help.

184.    A.C.'s mental and physical health have suffered greatly as a direct and proximate result of Instagram's actions and failures to act. A.C. cannot sleep or stay asleep most nights and wakes up in a panic. He has not had a good night's sleep for months and cannot stop thinking about the harms to his son and the harms Meta is causing other children, up to and including exploitation and even suicide.

185.    A.C. is suffering extreme anxiety and stress as a direct and proximate result of Meta's actions and failure to act to the point where it is impacting every aspect of his life and

health. He can no longer work for more than small periods of time, which has severely impacted his income and livelihood. He is having vision problems due to the stress, as well as incredible physical pain, including but not limited to extreme abdominal pain, trouble breathing, neck, shoulder, and back pain, and multiple other physical symptoms that have made it difficult for A.C. to perform basic functions on a day-to-day basis.

186.    A.C. is struggling with his mental and physical health far beyond anything he has ever experienced, to the point where it feels like something is broken inside of him. He cannot stop thinking and worrying about his son and the kids Meta is actively harming by allowing this known Instagram Predator to continue using its social media product for exploitation and abuse. He worries to the point of paralysis about the kids suffering the same trauma and life-altering harms foisted on his son and, even more, the kids who will turn to suicide as a result. For the first time in his life, A.C. feels as though things are out of control.  He is struggling under the knowledge that there is literally nothing more he can do to help those children, due to the way Meta decided to design and operate its product, and yet he feels as though he cannot move forward unless he tries to help to them.

187.    A.C. is struggling with the pain and guilt of knowing what is taking place on Instagram, the children who are being harmed, and how Meta could stop these harms; then having to live with the reality that he is doing everything he can and that despite all of his technical knowledge, experience, and efforts to get help, he cannot make Meta act.  Despite this realization, A.C. feels a moral obligation to do more and is drowning under the guilt of not being able to protect children from harm.

188.    But for Defendants' failure to conduct reasonable verification of age, identity, and/or parental consent, John Doe would not have been exposed to Instagram and Snap's inherently addictive and dangerous social media products and product features.

189.    But for Defendants' targeted marketing, misleading representations, and inherently defective and/or harmful disappearing message products, John Doe would not have suffered the exploitation and harms he did.

190.    But for Defendant Meta's inherently defective product, failure to provide effectual reporting mechanisms, and failure to act despite actual knowledge of harmful, illegal, and/or violating conduct perpetrated on minors because of its Instagram product, John Doe would not have suffered the exploitation and harms herein, and A.C. would not be suffering the ongoing mental anguish and emotional distress caused by his inability to protect his son and other children.

191.    A.C. is a web developer and considers himself sophisticated when it comes to computers, systems, and technology in general. He took all reasonable and recommended steps to protect and watch over his son, and to monitor his son's online activities, and then took every step available to prevent and mitigate the harms the moment he learned of them. Yet still, his knowledge and expertise never stood a chance against Meta's drive to increase engagement at any cost.

## VI.    PLAINTIFFS' CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

192.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

193.    Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

194.    Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition, and its defective condition was a cause of Plaintiffs' injuries.

195.    Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

196.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

197.    Defendants' products were unreasonably dangerous because they contain no effectual reporting mechanisms, or other means to ensure user safety, despite the incredible and inherent dangers they pose to minor users.

A.    **Inadequate Safeguards From Harmful and Exploitative Content**

198.    Snapchat and Instagram are defectively designed.

199.    As designed Snapchat and Instagram's recommendation and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not direct minors to harmful content and to do so without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate such safeguards would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

200.    As designed, Snapchat and Instagram recommendations and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all;

it is feasible to design an algorithm and technologies that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as sexual exploitation, bullying, and encouragement of self-harm and suicide.

201.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such risks and dangers and/or that Defendants' products would direct them to harmful users at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

202.    Snapchat and Instagram are defectively designed.

203.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

204.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

205.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes. Moreover, and as Defendants know, minor users lack the life experience and frontal lobe development necessary to protect themselves from such predators – providing access to these children is an inherently dangerous product mechanic, which dangers are known and have been studied by these defendants but were not otherwise known to the general public.

206.    Minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

207.    But also, predator users who are engaged in illegal, harmful, and/or violating activities also often open multiple accounts, such that Defendants know or have reason to know that the user is engaged in such harmful conduct and/or has violated their terms such that their use of the product is no longer duly authorized. Defendants are encouraging and creating these dangers and enabling these predators through their product features and refusal to enforce their own terms. Defendants also already have the information and means they need to ascertain with reasonable certainty their users' actual age, and when one user has multiple accounts. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, predatory users themselves, to the detriment of other, vulnerable users – including kids, to whom Defendants market and addictively design their products.

208.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

209.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products and would discourage the use of said products for exploitation and abuse of minors.

**C.    Provision of Inadequate and Unreasonable Parental Control and Monitoring Products and Processes**

210.    Snapchat and Instagram are defectively designed.

211.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

212.    It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

213.    Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

214.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.    Design of Addictive Social Media Products**

215.    Snapchat and Instagram are defectively designed.

216.    As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection.  In normal stimulatory environments, this dejection abates, and neutrality is restored.   However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from an addictive substance including

anxiety, irritability, insomnia, and craving.

217.    Addiction is not restricted to substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associate personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate.

218.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

219.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (1) becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in order to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or causes harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

220.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in order to assess subjects' social media use using the aforementioned addiction

criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

221.   BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

      a.    You spend a lot of time thinking about social media or planning how to use it.

      b.    You feel an urge to use social media more and more.

      c.    You use social media in order to forget about personal problems.

      d.    You have tried to cut down on the use of social media without success.

      e.    You become restless or troubled if you are prohibited from using social media.

      f.    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

222.   Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addiction. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM-5 and include:

      a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness,

anxiety, irritability).

b.      Tolerance, the need to spend more time using social media to satisfy the urge.

c.      Inability to reduce social media usages, unsuccessful attempts to quit using social media.

d.      Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.      Continuing to use social media despite problems.

f.      Deceiving family members or others about the amount of time spent on social media.

g.      The use of social media to relieve negative moods, such as guilt or hopelessness.

h.      and Jeopardized school or work performance or relationships due to social media usage.

223.    Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform.

224.    It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

//

**E.      Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

225.    Snapchat and Instagram are defectively designed.

226.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable.

227.    It is reasonable for parents to expect that social media products that actively promote their platform to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive. It is feasible for Snapchat and Instagram to design a product that identifies a significant percentage of their minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

228.    Likewise, it is feasible for Snapchat and Instagram to design a product that notifies parents when strangers attempt to engage directly with them, and/or otherwise limits the ability to find and access minors on their platforms, absent parental consent.

229.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users or even blocking users known to be engaged in exploitation and abuse because of their products.

230.    Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

231.    Moreover, it is reasonable for parents to expect that platforms such as Instagram and Snapchat, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement

technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger; and to identify abusive and violating users and block them.

232.    As a proximate result of these dangerous and defective design attributes of Defendants' products, John Doe suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design attributes in Defendants' products prior to 2022.

233.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff A.C. suffered emotional distress, physical harms, and pecuniary hardship arising from both his son's mental harm and Defendant Meta's refusal to accept and act on his well-documented reports.

234.    Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Snapchat and Instagram.

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

235.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

236.    Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiffs' injuries.

237.    Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects and inherent defects of Instagram and Snapchat.

//

238.    Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

239.    The magnitude of harm from use of Defendants' products is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

240.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in professional and scientific literature, but Defendants had actual knowledge of such harms.

241.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

242.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost.

243.    It is feasible for Defendants' products to report dangerous and/or harmful events impacting minor users to minor users' parents at negligible cost.

244.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

245.    As a result of Defendants' failure to warn, John Doe suffered mental harm from his use of Instagram and Snapchat.

246.    As a result of Defendants' failure to warn, Plaintiff A.C. has suffered emotional distress, physical harm, and pecuniary hardship.

247.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

## COUNT III – NEGLIGENCE

248.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

249.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as John Doe.

250.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, resulting in a diminished capacity to make good decisions regarding social media usage, eschew self-destructive behaviors, and overcome emotional and psychological harm.

251.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and distribution of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

252.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

253.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like John Doe, using their social media products.

254.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels

of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

255.    Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

256.    Defendants were negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

257.    Defendants were negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

258.    Defendants were negligent in failing to provide users and parents with reasonable and effectual reporting mechanisms, and for failing to enforce their own terms of service upon notice of illegal conduct and/or violations of terms – which failures resulted in harm to other users, including minor users who should not have had access to Defendants' products in the first place.

259.    As a result of Defendants' negligence, John Doe suffered severe mental harm.

260.    As a result of Defendants' negligence, Plaintiff A.C. suffered emotional distress, physical harm, and pecuniary hardship.

261.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton conduct toward underage users, including John Doe, whom they knew would be seriously harmed through the use of their social media products.

**COUNT IV – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL.**

**BUS & PROF. CODE §§ 17200, et seq.**

262.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

263.    Defendants are corporations and thus each of them is a "person," as defined by California Business & Professions Code § 17201.

264.   The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

265.   Defendants' conduct is unlawful as set forth in Counts I–III, above.

266.   Defendants' conduct is unlawful because they have knowledge of users under the age of 18 on their platforms who lack parental consent to use their products and, in fact, actively target, market to, and encourage use of their social media products by minors under the age of 18 who lack parental consent to use their products.

267.   Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including John Doe, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had Plaintiff A.C. known of the dangerous nature of Defendants' products, he would have taken early and aggressive steps to stop or limit his son's use of them.

268.   Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them. Additionally, Defendants have designed their products to lock-in users, especially children and teens. They know that minors want to use their products and that the more minors invest in Defendants' products the harder it is for them to switch. It is hard to switch because of network effects and sunk costs, and Defendants design their products explicitly around these designs for the purpose of locking-in users. As of now, each of these defendants have locked-in the majority (possibly over 80%) of all U.S. teens aged 13 to 17 and with access to the internet. Defendants are actively working to hit 100%.

269.   Defendants' conduct has resulted in substantial injuries that Plaintiffs could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

//

270.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained unfair advantages over similar businesses that have not engaged in such practices.

271.    As a result of Defendants' UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

272.    Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

## COUNT V – UNJUST ENRICHMENT

273.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

274.    As a result of Defendants' conduct detailed herein, Defendants received a benefit. Because Defendants' advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram and Snapchat, Defendants benefited directly from John Doe's unauthorized use of their products and also from the predatory user (and predatory users in general) enabled and assisted by Defendants' products.

275.    It would be unjust and inequitable for Defendants to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendants' acts and omissions described herein.

276.    Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

277.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

278.    Defendants intentionally intruded upon Plaintiff A.C.'s solitude, seclusion, or private affairs by designing their product with features that frustrate and interfere with parents' ability to monitor and control their children's social media usage.

279.    These intrusions are highly offensive to a reasonable person, particularly given Defendants' interference with the fundamental right of parenting and their exploitation of children's special vulnerabilities for commercial gain.

280.    Plaintiffs were harmed by Defendants' invasion of privacy, as detailed herein.

281.    Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendants to cease the harmful practices described throughout this complaint.

## COUNT VII – INFLICTION OF EMOTIONAL DISTRESS

### (as against Defendant Meta only)

282.    Plaintiffs reallege each of the allegations in the preceding paragraphs as if full set forth herein.

283.    Defendant Meta engaged in extreme and outrageous conduct with reckless disregard of the probability of causing severe emotional distress to Plaintiffs and others when it failed to provide parents with a reasonable and effective means to report unauthorized use, illegal conduct, and violations of Meta's terms of service that posed significant danger to their children and other young users.

284.    Defendant Meta likewise engaged in extreme and outrageous conduct when it received notice of the publication of CSAM from a concerned parent and failed to respond, delayed its response, and/or ultimately failed to act reasonably to protect its minor users.

285.    Defendant Meta likewise engaged in extreme and outrageous conduct when it made the decision to allow the Instagram predator to continue using its product, and ignored repeated reports, with documentation, and pleas from Plaintiff A.C. to protect its minor users.

286.    Plaintiff A.C. first reported the predator account on May 14 and reported it from both John Doe's Instagram as well as his own. Meta proceeded to not respond and delay its response, then claimed technical issues. It took several days for the user account to go dark, but even then, Meta refused to say whether it had disabled the account and/or whether any action had been taken with the Group Chat created to sextort A.C.'s minor child – in fact, Meta was instead

1  allowing the Group Chat to continue, with addition of more users and escalating publication of
2  CSAM, despite actual knowledge of what had occurred.

3       287.   Meta's own internal documents make clear that it is aware of the dangers of its
4  product, including the potential for exploitation and abuse. Despite this knowledge, Meta has
5  refused to provide parents with any reasonable and effective means to report such harms and
6  protect their children.

7       288.   Meta's conduct was outrageous and offensive by any measure.

8       289.   It is inconceivable that any company would distribute its product to children and
9  then fail to provide parents with a means to contact them and/or effectively report harms once
10  discovered – though that is precisely what Meta did.

11      290.   Plaintiff A.C. has suffered severe emotional, physical, and pecuniary harms as a
12  result.

13      291.   Plaintiffs therefore seek damages in amounts to be determined at trial.

14                          **DEMAND FOR JURY TRIAL**

15      Plaintiffs hereby demand a trial by jury.

16                          **PRAYER FOR RELIEF**

17      WHEREFORE, Plaintiffs pray for judgment against Meta and Snap for monetary
18  damages for the following harms:

19      1.     Past and ongoing physical and mental pain and suffering of John Doe, in an
20  amount to be more readily ascertained at the time and place set for trial.

21      2.     Loss of future income and earning capacity of John Doe.

22      3.     Past and future medical expenses of John Doe.

23      4.     Monetary damages suffered by A.C.

24      5.     Loss of future income and earning capacity of A.C.

25      6.     Past and future medical expenses of A.C.

26      7.     Past and ongoing physical and mental pain and suffering of A.C., in an
27  amount to be more readily ascertained at the time and place set for trial.

28      8.     Punitive damages.

1        9.      For the reasonable costs and attorney and expert/consultant fees incurred in

2  this action.

3        10.     For injunctive relief.

4        11.     Such other and further relief as this Court deems just and equitable.

DATED: February 9th, 2022          SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____

Laura Marquez-Garrett SBN 221542
Laura@socialmediavictims.org
Matthew P. Bergman
matt@socialmediavictims.org
Glenn S. Draper
glenn@socialmediavictims.org
Sydney Lottes, SBN 345387
sydney@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Tel: (206) 741-4862   Fax: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Tel: (973) 639-9100   Fax: (973) 679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Tel: (503) 702-0218   Fax: (503) 768-6671

Attorneys for Plaintiffs